Filed 10/16/20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073545 |
| v. | (Super.Ct.No. FWV028738) |
| GERALDO CROLL BASCOMB II, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Elia V. Pirozzi, Judge. Affirmed.

Elisa A. Brandes, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

In 2000, appellant Geraldo Bascomb and another man committed a home invasion robbery during which the second man shot and killed one of the residents. In 2005, a jury found Bascomb guilty of first degree felony murder and assault with a deadly weapon, and the trial court sentenced him to a prison term of 27 years to life.

In 2018, the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437), which, among other things, amended the definition of felony murder so that an accomplice to an underlying felony who was not the actual killer can't be convicted of felony murder unless they aided in the murder with the intent to kill or were "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] section 190.2." (Pen. Code, § 189, subd. (e).) SB 1437 also added Penal Code section 1170.95, which establishes a procedure for vacating murder convictions predating the amendment that could not be sustained under the new definition of felony murder. (Stats. 2018, ch. 1015, § 4.)

Bascomb challenges the trial judge's denial of his Penal Code section 1170.95 petition to vacate his murder conviction, arguing there was insufficient evidence he acted with reckless indifference to human life. We conclude the trial judge's finding is amply supported by the record and therefore affirm the order denying his petition.

## I

## FACTS

A. *The Offense and Conviction*

We take the facts from the unpublished opinion we issued in 2007, affirming

2

Bascomb's convictions in case No. E039784.[1] (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1134, 1138, review granted Mar. 18, 2020, S260598 [in determining the sufficiency of a section 1170.95 petition, the court may review the record of conviction, which includes the opinion in a defendant's direct appeal].)

On the afternoon of January 28, 2000, marijuana salesman James Moser and his girlfriend Hoover were in the bedroom of his apartment getting ready to go shopping. Moser's roommates Lind and Flores were also in the apartment. Lind was asleep in the bedroom he and Flores shared and Flores was in the living room watching T.V. At about 2:00 p.m., Flores answered a knock at the front door and two men armed with guns, Bascomb and a man called Blue, pushed their way into the apartment. Bascomb and Blue forced Flores to lie face down on the living room floor and Bascomb held a gun on him from a distance of about five or six feet for the next several minutes. Blue entered Moser's bedroom and, after a brief struggle, shot him. Hoover was in the bathroom during the shooting but was able to observe some of what was going on through the partially opened door. After the shooting, Blue and Bascomb quickly left together. Flores, who thought he was going to be shot and was afraid the entire time, raised his hands and said, "Don't shoot. Don't shoot." Moser died about 30 minutes later as a result of the gunshot wound.

---

[1] We take judicial notice of the appellate record of Bascomb's criminal trial, case No. E039784. (Evid. Code, § 452, subd. (d).) We refer to appellant as Bascomb and make a few minor clarifying edits, but the facts about the robbery recounted here are identical to the facts recounted in our prior opinion.

Meanwhile, Garcia, one of Moser's customers, saw Bascomb and another man running away from the apartment complex. As they passed, Bascomb nodded and Garcia recognized him as a member of his high school football team. Garcia checked his Upland High School yearbook, found Bascomb's picture in a team photograph, and gave the yearbook page to police investigating the scene. Neither Flores nor Hoover was able to identify Bascomb from a photographic line up containing a more current picture.

The day after the killing, Bascomb called his girlfriend Davis and asked her to pick him up in Upland. During the drive from Upland to Moreno Valley, where Davis lived, Bascomb appeared to be upset; he told Davis he had gone with a friend "to jack somebody and it went bad." Davis understood "jack" to mean "rob." At various times over the next three years, Bascomb told Davis details of the shooting incident: that he and his friend had gone to the victim's house to get "weed," that he stayed in the living room while his colleague went to the bedroom to do the robbery, and that someone he knew from high school recognized him as he was leaving. Bascomb also told Davis that after the incident a person named "Tree" was going to get him some new identification papers. Bascomb received mail in the name of "John Marshall" during the time he lived with Davis.

On July 16, 2003, Bascomb and Davis broke up. After she locked him out of her apartment, Bascomb called police to help him retrieve his clothes. Davis, who knew Bascomb only as "G," was unsure of his real name. The following day, she contacted Detective Anthony Yoakum of the Upland Police Department and gave him information

4

about Bascomb's possible involvement in the crime and how he might be found. Bascomb was arrested in Ontario on August 12, 2003.

Yoakum interviewed Bascomb at the Upland Police Department about three hours after his arrest. During his time at the police station, he was allowed to use the bathroom and was offered water, sodas, and food. After Yoakum read Bascomb his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), Bascomb indicated he was willing to talk. As the two-hour recorded interview got underway, Yoakum told Bascomb that being "honest and upfront about everything right from the beginning [¶] . . . [¶] is the best thing for you," and " . . . if you're not truthful, then that makes you look more like . . . the one that's got something to hide," adding, " . . . the more helpful you are now in getting to the bottom of this, the better it will be for you in the – in the future when all this stuff's going through." The detective urged Bascomb to reveal the identity of his accomplice partly by explaining what he would do if he were in Bascomb's shoes: "[I]f there was anything that I can do to help myself out, I would do that and what that means is I would be telling what I knew . . ." In response Bascomb said, "Now I don't want to . . . incriminate anyone else but me. . . . I know that if I cooperate a hundred percent, I'm sure I can get less time or something – some – I'm not even sure, but I might be able to or it could help my situation." To this suggestion, Yoakum answered, "True. Yeah, I'm not sure either, but – [¶] . . . [¶] – that's just from, you know, from past experience."

5

Later, Bascomb explained he considered all his choices bad because if he betrayed his accomplice he would be considered a "rat," while if he did not, he would " . . . do someone else's time and then I'll be considered a fool. [¶] [¶] Fool, rat; fool – look over your shoulder either way." To which Yoakum replied, "In jail the rest of my life or – or being out here . . . still having some freedom, still being able to have a girlfriend and have a life, maybe get a job. Still looking over my shoulder, but still being able to see my family, seeing any kids or future kids I might have." Still later, when Bascomb again refused to divulge information about Blue, saying, "It really might not even help me to give him up . . . ," Yoakum replied, "I disagree. I think it would help."

Eventually, in bits and pieces, Bascomb admitted his involvement in the murder. The plan to rob Moser of the marijuana was his; he drove with Blue to the victim's apartment; he had a gun when he entered the apartment; he told Flores to get down and pushed him to the ground; he held the gun on Flores and told him not to move; he left the apartment with Blue right after the crime; he had used the alias "John Marshall" in the years between the crime and his arrest. Bascomb took full responsibility for the shooting: "This was my idea to go over there," and, "If it wasn't for me, this shit wouldn't have happened, is the bottom line, whether I was the trigger man or not." He also explained the motive for his confession and refusal to implicate Blue: "I just want to be able to sleep easy myself tonight."

On October 20, 2003, the San Bernardino County District Attorney filed an information charging defendant with first degree murder and assault with a deadly weapon. (Pen. Code, §§ 187, subd.(a), 245, subd. (a)(2), unlabeled statutory citations refer to this code.) Hoover, Lind, Flores, Garcia, Davis, and Yoakum were among the witnesses who testified at Bascomb's six-day trial.

Before being called before the jury, Yoakum also testified in an Evidence Code section 402 hearing in which defense counsel sought to exclude the tapes of the interview. Despite the fact that Bascomb had answered "yes" to each of Yoakum's specific *Miranda* questions, counsel insisted he had not expressly waived his rights. After listening to argument from both sides, the trial court found Bascomb's waiver valid under the totality of the circumstances of the case and ruled the interview admissible. Bascomb, the court pointed out, had said that he understood each of the specified rights and had talked to the detective "in a forthcoming manner for somewhere close to two hours without . . . indicating that he was done or wanted an attorney . . . ." Without objection from defense counsel on any other grounds, the audiotape of the interview was played for the jury.

On October 21, 2005, the jury found Bascomb guilty of both crimes. On January 19, 2006, the court sentenced him to 25 years to life in state prison for the murder and a consecutive term of two years for the assault with a deadly weapon.

In 2007, we affirmed Bascomb's conviction over his objection that the interview tape was an involuntary confession because Yoakum made implied promises of leniency and the objection that the assault with a deadly weapon conviction wasn't supported by substantial evidence. On December 5, 2007, the Supreme Court denied Bascomb's petition for review of our decision.

B. *The 1170.95 Petition*

On January 7, 2019, Bascomb filed a petition under newly enacted Penal Code section 1170.95, which, among other things, allows people convicted of felony murder to take advantage of certain subsequent amendments affecting the definition of that offense. He explained the changes to the law and why he thought he qualified for relief. Bascomb declined appointed counsel and elected to represent himself.

The prosecutor opposed the petition arguing Bascomb didn't qualify for relief because he would have been convicted of felony murder even under the amended statute. Specifically, they argued Bascomb was a major participant in the underlying crimes who acted with reckless indifference to human life.

The trial judge held a hearing on June 14, 2019. With the agreement of the parties, he took judicial notice of the record of conviction. He determined Bascomb had stated a prima facie case for relief, issued an order to show cause, and set the matter for further proceedings.

At the evidentiary hearing, the parties agreed the trial judge should decide the matter based on the facts in the preliminary hearing transcript and our prior opinion.

8

Though section 1170.95 specifically allows the introduction of new or additional evidence, the parties agreed they would not do so. The judge then took the case under submission.

On July 3, 2019, the judge denied the petition. He took the factual history from our unpublished opinion in Bascomb's first appeal and took judicial notice of the information, abstract of judgment, jury instructions, preliminary hearing transcript, and verdict forms from the underlying case. He concluded the prosecution had proved beyond a reasonable doubt that Bascomb was a major participant in the attempted robbery and had acted with reckless indifference to human life. The court concluded, "The plan [Bascomb] devised and implemented contributed to a heightened risk to human life. The totality of these circumstances constitutes substantial evidence that [Bascomb's] own personal involvement in the crime was extensive, and not minor, and he was subjectively aware that his planning and participation in the underlying felony involved a grave risk of death and demonstrated reckless indifference to human life."

Bascomb filed a timely notice of appeal.

## II

## ANALYSIS

Bascomb challenges the sufficiency of the evidence that he had the degree of malice required to establish felony murder under section 189, as amended by SB 1437. He doesn't contest that he was a major participant in the robbery, a sound choice since he admitted to planning the crime. However, he argues the evidence is insufficient to

support the finding that he acted with reckless disregard for human life.[2] That means, he says, he is entitled to be resentenced under section 1170.95.

A. *Senate Bill 1437*

"Generally, malice is an essential element of the crime of murder. (§ 187.) Malice may be either express or implied. It is express 'when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature.' (§ 188, subd. (a)(1).) It is implied 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (*Id*. at subd. (a)(2).) Implied malice has "'both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' . . . The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.'"" (*People v. Johns*, *supra*, 50 Cal.App.5th at p. 57.)

Before SB 1437, the felony-murder rule was an exception to the actual malice requirement. The felony-murder rule made "a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state." (*People v. Chun* (2009) 45 Cal.4th 1172, 1182.) First degree felony murder was "a killing during the course of a felony specified in [Penal Code] section 189, such as rape, burglary, or

---

[2] The trial judge also determined SB 1437 was unconstitutional. That view has been soundly rejected by every division of the Court of Appeal, including this one. (E.g., *People v. Johns* (2020) 50 Cal.App.5th 46.) The People rightly concede the issue, so we have limited our discussion throughout the opinion to the question whether the trial judge erred in finding Bascomb was a major participant who acted in reckless disregard for human life, an independent, alternative basis for the order denying his petition.

robbery." (*Ibid.*) Thus, when Bascomb was convicted and sentenced, an offender who participated in a robbery but wasn't the actual killer could be convicted of first degree murder under the felony-murder rule.

Effective January 1, 2019, the Legislature changed the substantive definition of murder by enacting SB 1437. The new law was designed "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (SB 1437, § 1.) Relevant to this case, SB 1437 removed the exception that had allowed a first degree murder conviction under the felony-murder rule in the absence of malice. As amended, Penal Code section 188 directs malice may not "be imputed to a person based solely on his or her participation in a crime." (Pen. Code, § 188, subd. (a)(3).) Instead, "to be convicted of murder, a principal in a crime shall act with malice," unless the narrowed felony murder applies.

Under new subdivision (e) of section 189, "[a] participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder *only if* one of the following is proven: [¶] (1) The person was the actual killer[;] [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree[;] [¶] [or] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as

11

described in subdivision (d) of [Penal Code] section 190.2."[3] (§ 189, subd. (e), italics added.)

The Legislature also added section 1170.95 to the Penal Code, which creates a procedure for offenders previously convicted of felony murder to obtain the benefits of these changes retrospectively. Such convicts may petition for relief in the court where they were sentenced. If they make a prima facie showing they "could not be convicted of first or second degree murder because of changes to Section 188 or 189," they're entitled to "a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not . . . previously been sentenced." (§ 1170.95, subds. (a)(3), (c), (d)(1).) The prosecution bears the burden of proving beyond a reasonable doubt that the petitioner is not eligible for rehearing, and both parties may rely on the record of conviction or offer new or additional evidence. (§ 1170.95, subd. (d)(3).) As we've seen, in this case, both parties chose to rely on the record.

If the petitioner is entitled to relief, and "murder was charged generically, and the target offense was not charged, the petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes." (§ 1170.95, subd. (e).)

---

[3] The limitations in subdivision (e) don't apply when the victim is a peace officer killed while in the course of their duties and where the defendant knew or reasonably should have known as much. (§ 189, subd. (f).)

12

Here, it's uncontested that Bascomb was not the actual killer and didn't intend to kill the victim, and he doesn't contest that he was a major participant, so his appeal implicates only the question whether he acted with reckless indifference to human life when he participated in the attempted robbery.

B.  *Application*

Bascomb argues the evidence is insufficient to support the trial judge's finding that he acted with reckless indifference to human life. The People argue he falls squarely into the definition of a major participant who acted with reckless indifference to human life. We agree with the People.

We review de novo questions of statutory construction. (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041.) "Our primary task 'in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent.'" (*Ibid.*) We review the trial court's fact finding for substantial evidence. (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 320.) We "must review 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Hatch* (2000) 22 Cal.4th 260, 272.)

To act with a reckless indifference to human life, "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1021, citing *People v. Banks* (2015) 61 Cal.4th 788, 801 (*Banks*).) Reckless indifference requires "a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*In re Bennett*, at p. 1021, citing *People v. Clark* (2016) 63 Cal.4th 522, 617 (*Clark*).)

The defendant "must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create" and must have "subjectively appreciated" his act was "likely to result in the taking of innocent life." (*Banks*, *supra*, 61 Cal.4th at pp. 801-802.) Participation "in a garden-variety armed robbery" where "death might be possible but not probable" is insufficient. (*Banks*, at p. 802.) A knowledge of the possible risk of death inherent in certain felonies like armed robbery does not satisfy the reckless indifference standard. (*Id.* at p. 809.)

In *Banks*, the California Supreme Court described the spectrum of culpability of people involved in murders that occur during the commission of underlying felonies. Courts often refer to this spectrum as the *Tison-Endmund* spectrum because it derives from the U.S. Supreme Court cases *Tison v. Arizona* (1987) 481 U.S. 137 and *Enmund v. Florida* (1982) 458 U.S. 782. "At one extreme [are] . . . minor actor[s] in an armed

14

robbery, not on the scene, who neither intended to kill nor [were] found to have had any culpable mental state." (*Banks*, *supra*, 61 Cal.4th at p. 800.) "At the other extreme [are] actual killers and those who attempted or intended to kill." (*Ibid.*) The change to the felony-murder rule affects those people who fall '"into neither of these neat categories"'—people who were major participants in the underlying felony and acted with a reckless indifference to human life. (*Ibid.*)

Our high court articulated several factors intended to aid in determining whether a defendant falls into this middle category. "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or *using* lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant *present at the scene* of the killing, in a position to facilitate or *prevent* the actual murder, and did his or her own actions or *inaction* play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, italics added.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

The defendant in *Banks* was convicted of first degree murder with a felony-murder special circumstance based on his having acted as the getaway driver for an armed robbery in which his codefendant Banks and others participated, and in which Banks shot and killed one of the robbery victims while escaping. (*Banks*, *supra*, 61 Cal.4th at pp.796-797.) Considering the defendant's involvement in the robbery against the factors

15

just enumerated, the Court placed him near the least culpable pole of the *Tison-Enmund* spectrum. As a result, the Court concluded the jury's finding that Banks was a major participant who acted with reckless indifference for human life could not stand.[4] (*Banks*, at p. 811.)

Not long after *Banks*, the Court revisited this issue in *Clark*, also concluding the evidence was insufficient to find the defendant had acted with reckless disregard for human life. (*Clark*, *supra*, 63 Cal.4th at p. 611.) The defendant in Clark *planned* a burglary of a computer store to occur after the store was closed. According to the plan, his codefendant was to carry out the burglary and carry an unloaded gun. However, his codefendant ended up carrying a gun loaded with one bullet and fired that bullet when he unexpectedly encountered a store employee, killing her. (*Id.* at pp. 612-613.) Our high court concluded there was insufficient evidence Clark acted with reckless indifference to human life because (a) Clark was not physically present when his codefendant killed the employee and was therefore unable to intervene; (b) there was no evidence Clark knew his codefendant was predisposed to be violent; and (c) Clark planned for the robbery to take place after the store closed, and the gun was not supposed to be loaded. (*Id.* at pp. 619-622.) In sum, the court believed there was "nothing in [Clark's] plan that one can

---

[4] *Banks* involved a jury's special-circumstance finding that the defendant was a major participant who acted with reckless disregard for human life under section 190.2, subdivision (d). The difference is immaterial because the amended felony-murder statute incorporates the identical standard by reference. (§ 189, subd. (e) [felony-murder rule applies to an offender who is a "major participant in the underlying felony and acted with reckless indifference to human life, *as described in subdivision (d) of Section 190.2*"], italics added.)

16

point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id.* at p. 623.)

By contrast, Bascomb was willingly involved in the violent manner in which the robbery took place. First, though Bascomb concedes he was a major participant, it's still important to evaluating whether he acted with reckless disregard for human life that he admitted planning the robbery. It means he cooked up a plan to break into the home of a known drug dealer while they were home and to use force, including firearms, to steal the dealer's product. Moreover, Bascomb and Blue not only pushed their way into the home armed, but they forced one victim to the ground and used their guns to threaten the residents and keep them pinned down throughout the duration of the robbery. That means Bascomb didn't just watch without intervening as his accomplice accosted the murder victim in his bedroom, he used his weapon to keep the other victims at bay and thereby actively enabled the murder. Nor did he help the victim once he had been shot, but instead fled. We agree with the People that this sort of conduct easily meets our state's standard for what constitutes being a major participant who acted with reckless indifference to human life.

Bascomb attempts to minimize the violence inherent in the way they carried out the robbery. He concedes he and Blue "rushed the door and forced [one of the victims] to the floor." But he insists, "no evidence was introduced that the two used any more force than was necessary to cause Flores to stay on the floor" and asserts "the purpose of the restraints was presumably to prevent the violence that would result if [the victim]

17

resisted." This is a deflection from what's important in these events. Even if Bascomb forced the victim to the ground gently, the critical fact is he did so backed by the threat of violence of a firearm, a threat which continued long enough to allow Blue to accost the murder victim alone in his bedroom. The primary purpose of this threat was to enable the robbery, not avoid violence. And while Bascomb may not have intended for either perpetrator to use his firearm, the evidence concerning the manner in which they carried out the robbery is sufficiently weighty to support the trial judge's find that he acted in reckless disregard for human life.

Bascomb also argues there was no evidence he understood the risk of armed confrontation because there was no evidence he knew who would be home and he chose a time (Friday at 2:00 p.m.) when the residents were likely to be at work. We find this characterization of the facts misleading. Bascomb plainly understood someone could be home in the middle of the day. In the first place, though many people still work a conventional 9-to-5 job, very many do not. Second, Bascomb knew the victim to be a marijuana dealer; that's why he was at the apartment. In any event, if they had wanted to avoid a confrontation, they could have done so when someone answered their knock at the door. Instead, they immediately pushed their way in and forced the person who answered to the floor. This strongly suggests confronting people inside the home was part of the plan. As the trial court fairly concluded under this evidence, "[t]his was not a robbery of a convenience store, or a person on the street in which resistance, if any, would be slight, and armed resistance likely nonexistent. This was the planned, armed

18

robbery of a known drug dealer at his residence." This conclusion is amply supported by the record.

As we said in *People v. Law*, "we are not aware of a single case that concludes a defendant who personally committed a robbery, used a gun, and was present for the shooting did not meet the standard" of culpability required to support a felony murder conviction. (*People v. Law* (2020) 48 Cal.App.5th 811, 825.) The defendants who have shown their culpability was too slight under *Banks* and *Clark* "are those who were not wielding guns themselves and also not present for the shooting (either because they were acting as getaway drivers or because they were involved in the planning of the crime only)." (*Ibid.*; see also, e.g., *In re Miller* (2017) 14 Cal.App.5th 960, 965 [defendant played the role of "spotter" who would select the robbery target and was not at the scene of the robbery/murder]; *In re Bennett*, *supra*, 26 Cal.App.5th at p. 1019 [defendant was involved in planning the robbery but was not at the scene of the murder]; *In re Taylor* (2019) 34 Cal.App.5th 543, 559 [defendant acted as getaway driver and was not at the scene of the murder].) Bascomb's culpability is far more significant.

We therefore conclude the trial court properly denied Bascomb's petition. There is sufficient evidence in the record to sustain the trial court's finding that he acted with reckless indifference for human life by planning and participating in this home invasion robbery.

19

### III

### DISPOSITION

We affirm the order denying Bascomb's section 1170.95 petition.

CERTIFIED FOR PUBLICATION

SLOUGH  _____
<br>
J.

We concur:


RAMIREZ  _____
<br>
P. J.


McKINSTER  _____
<br>
J.